In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1449

BASHIR SHEIKH,

*Plaintiff-Appellant,*

*v.*

GRANT REGIONAL HEALTH CENTER,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 11 C 1 — **William M. Conley**, *Chief Judge*.

ARGUED SEPTEMBER 16, 2014 — DECIDED OCTOBER 14, 2014

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. In 2009 the plaintiff, a physician, was hired by the defendant, a small "critical access" hospital in rural Wisconsin, as the director of its emergency room. (A critical access hospital is a hospital "having no more than 25 inpatient beds; maintaining an annual average length of stay of no more than 96 hours for acute inpatient care; offering 24-hour, 7-day-a-week emergency care; and being located in a rural area, at least a 35-mile drive away from any other

hospital." U.S. Dept. of Health & Human Services, "What Are Critical Access Hospitals (CAH)?," www.hrsa.gov/healt hit/toolbox/RuralHealthITtoolbox/Introduction/critical.html, visited Sept. 29, 2014.) Fired just months after being hired, he sued the hospital in January 2011 under Title VII, claiming that the hospital had discriminated against him because of his Indian ethnicity. (The complaint added supplemental state law claims to his Title VII claim.) For example, he contended that a hospital employee said to him "you must be that Middle Eastern guy whom they hired as ER director" and accused him of taking her job, spat at him, and told him he belonged to a terrorist class of people and was a danger to the hospital. A number of hospital personnel complained to the plaintiff's superior that he was incompetent—that he had poor patient skills, behaved unprofessionally, misdiagnosed patient ailments, and couldn't get along with the hospital's staff. His superior urged him to resign. That was less than a month after he had begun working at the hospital, a period during which he worked only twelve shifts. He refused to resign, but not long afterward was fired by the hospital's CEO.

He sued pro se, but later obtained a lawyer, who subsequently withdrew, and so the plaintiff was again representing himself. In May 2012 the hospital filed what the plaintiff's opening brief in this court acknowledges was a "heavily supported" motion for summary judgment. The district judge gave the plaintiff until July 16 to respond, stating that "**no further extensions will be granted to plaintiff for *any* reason. Plaintiff should plan accordingly**" (emphasis in original). Shortly before the deadline, the plaintiff obtained a new lawyer, who on July 16 filed a brief opposing the hospital's summary judgment motion, with some supporting ma-

terials. The brief proposed findings of fact, but did not respond directly to the hospital's proposed findings of fact in support of the motion for summary judgment.

The plaintiff—not his lawyer—submitted two affidavits (both dated July 16, the deadline for filing, but the second affidavit wasn't filed until the next day) purporting to respond to the hospital's motion. The judge struck the second affidavit as untimely, which it was, having been filed after the July 16 deadline. The plaintiff neither sought permission to make untimely filings nor gave any reason for not having filed the affidavit on time.

The first affidavit is very strange, because all it does is attach the hospital's *Human Resources Policies and Procedures Manual*, its *Medical Staff Bylaws*, and the letter terminating the plaintiff. All these materials were already part of the record. They are voluminous (except for the letter of termination), yet the affidavit contains no commentary on them.

The second affidavit is more promising; it consists of 166 paragraphs of facts and arguments. Yet it isn't actually an affidavit—it isn't notarized or otherwise witnessed—though it might pass muster as a declaration, which can be substituted for an affidavit and thus constitute part of the evidentiary record, provided it complies with the formalities required by 28 U.S.C. § 1746.

The defendant quickly responded to the plaintiff's filings, pointing out not only that the second affidavit was untimely (the first affidavit was irrelevant, as it merely attached, without commentary, materials already in the record), but also that it confronted the defendant with two sets of proposed findings of fact to evaluate: the set submitted by the

plaintiff's (second) lawyer on July 16, and the 166 paragraphs submitted by the plaintiff himself the next day. There were many discrepancies between the two sets of proposed findings, and those discrepancies would have made it difficult for the defendant to respond within the deadline fixed by the judge (who was becoming impatient). A further oddity is that the second affidavit is just a set of proposed findings, even though the plaintiff's excuse for filing it was that his lawyer, though he had filed a set of proposed findings on the plaintiff's behalf, had failed to reply to the defendant's proposed findings.

Two weeks after the judge struck the plaintiff's two affidavits, the plaintiff's lawyer (his second lawyer, remember) filed a motion to withdraw from representing the plaintiff. Simultaneously the plaintiff filed a motion to discharge the lawyer for having failed (which indeed he had) to respond adequately to the hospital's motion for summary judgment. The plaintiff also requested permission to respond himself to the defendant's proposed findings of fact that had underlain the defendant's motion for summary judgment and that the plaintiff's lawyer had failed to respond to.

The judge granted the plaintiff's motion to discharge the lawyer, and so the plaintiff was once again proceeding pro se. But the judge declined to give him any additional time within which to respond to the defendant's proposed findings of fact, on the ground that whether to grant summary judgment had been fully briefed. Eventually the judge granted the motion for summary judgment, dismissing the plaintiff's federal claims with prejudice and his state law claims without.

The plaintiff requested reconsideration, arguing that the judge had never ruled on whether to accept additional supplementary responses to the hospital's motion for summary judgment. The judge denied the request for reconsideration, repeated the denial after the plaintiff renewed the request in November, and three months later issued a final judgment terminating the litigation. The grant of summary judgment also operated as a denial of the plaintiff's motion to be allowed to file responses to the defendant's proposed findings of fact. But the judge did remark that he had considered the proposed findings submitted by the plaintiff's second lawyer—had deemed them responsive to the defendant's proposed findings, even though (though the judge didn't say this) they weren't really. But the judge's consideration of the lawyer's proposed findings had not saved the day for the plaintiff.

The plaintiff does not ask us to order the judge to reinstate the second affidavit (the 166 paragraphs). He refers at times to the affidavit but only to illustrate the kind of findings he would have submitted had the judge allowed him to. His critical argument is that the judge erred in not allowing him to submit a belated response to the defendant's proposed findings of fact. Not so, quite apart from the fact noted earlier that this would have required the defendant to supplement its original response to the plaintiff's proposed findings of fact. Represented by counsel, as he still was when he filed the affidavits, the plaintiff wasn't authorized to file his own responses to the hospital's motion. He both had a lawyer and was acting as his own lawyer. That was a confusing mode of representation and one not permitted, though he did ask for permission to file a response to the defendant's proposed findings of fact at the same time that he

asked the court to dismiss his attorney—so had the judge granted both requests simultaneously, the plaintiff would properly have submitted the response pro se.

About all that can be said in the plaintiff's favor—and it is too little to affect the judgment—is that the judge should not have said that "**no further extensions will be granted to plaintiff for *any* reason**" (emphasis in original). Had the submission of a complete response to the hospital's motion been prevented by something that no one could have foreseen or avoided, a refusal to grant an extension of time would have been unjustified. But the judge's impatience was understandable. (And nothing ever did happen to prevent the plaintiff from making a timely submission.) There are 147 entries in the district court docket of this case, stretching over three years, yet without an evidentiary hearing of any sort ever having been held, let alone a trial. Much of the delay was the result of the plaintiff's unhappy relationship with the two lawyers whom he hired after initially suing pro se. In effect he had six lawyers: himself, proceeding pro se, on three separate occasions, and in between, and afterward (on appeal), three real lawyers.

The *coup de grâce* is that the plaintiff has never offered an excuse for what he contends was his second lawyer's incomplete response to the hospital's motion for summary judgment. Incomplete it was; indeed it violated the district court's standing order on summary-judgment procedure because it didn't respond directly to the defendant's proposed findings of fact. (The judge thus gave the plaintiff a small break by deeming the lawyer's proposed findings "responsive" to the defendant's proposed findings.) The plaintiff argues that it was not his fault that his lawyer screwed up. But

in civil litigation the lawyer's errors are attributed to the client; the client's only remedy is an action for malpractice. Were the principal not responsible for his agent's efforts, litigation would be even more chaotic than it is.

Against a rule of attribution the plaintiff cites *Hill v. United States*, 762 F.3d 589, 591 (7th Cir. 2014), where after noting that "ordinarily … the pratfalls of a party's lawyer are imputed to the party," we said that "given the unusual gravity of the plaintiff's injuries, the absence of any suggestion of prejudice to the defendant from the delay in suing, and the district judge's cursory treatment of the issue of equitable tolling, we have decided that the judgment should be vacated and the case remanded to the district court for further consideration of the tolling issue." It was an unusual case. The plaintiff, suing under the Federal Tort Claims Act in respect of prison violence that had cost him one eye and greatly impaired the vision in his other eye and that he attributed to the negligence of the Bureau of Prisons, had recently been evicted from the halfway house to which he had been consigned upon his release from prison and had failed to notify the court of his new address. The district court denied the plaintiff's plea of equitable tolling not because of his lawyer's delay in filing suit but because of the plaintiff's failure to keep the court advised of his changes of address. So while the plaintiff's lawyer had bobbled his case, the ground of dismissal was the plaintiff's bobble, which we thought, given his physical condition, was a weak ground for dismissal. We did not rule that his case should not have been dismissed, but we remanded for a fuller consideration of the unusual issue that it presented. There is nothing comparable in this case. As we said, the judge should not have told the plaintiff there would be no extensions of time, no matter

what, for responding to the hospital's motion for summary judgment. But because no excuse for missing the deadline was ever offered, the "no extensions no matter what" threat was never carried out.

AFFIRMED.